Clinton S. LUTKINS, Sidney W. Davidson and United States Trust Company of New York, as Executors, etc.

v.

The UNITED STATES.

No. 279–60.

United States Court of Claims.

Feb. 6, 1963.

Rehearing Denied April 5, 1963.

Whitaker, Judge, dissented.

———◆———

Ben R. Clark, New York City, for plaintiffs. Sidney W. Davidson, and Davidson, Dawson & Clark, New York City, on the briefs.

Cynthia G. Holcomb, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith and Philip R. Miller, Washington, D. C., on the brief.

LARAMORE, Judge.

Plaintiffs sue for recovery of income taxes paid on reported capital gains resulting from exchange of stock in one corporation for voting stock in another. The question to be determined in this case is whether the transaction, as later outlined, was a non-taxable exchange under section 112(b) (3) of the Internal Revenue Code of 1939, 26 U.S.C. § 112(b) (3) (1952).

In 1912 the American Machine & Foundry Company (hereinafter called American), a New Jersey corporation, acquired in exchange solely for 11,000 shares of its common stock (which was its only stock having voting rights) 65,375 shares of the capital stock of International Cigar Machinery Company (hereinafter called International). In the same exchange, American also acquired several other items not material to this case. The capital stock of International was its only stock and its sole voting stock. The 65,375 shares represented 65.375 percent of International's 100,000 total issued shares of capital stock. In 1952, American offered the shareholders of International an exchange of one and one-third shares of its common stock for each share of the capital stock of International. Consummating the acceptance of this offer, American issued 235,918⅔ shares of its com-

mon stock to the shareholders of International in exchange for 176,939 shares of capital stock of that company. Due to the fact that the capital stock of International had been split three-for-one in 1927, and two-for-one in 1930, these 176,-939 shares amounted to 29.489 percent of its total issued outstanding stock. Therefore, in 1952 American owned 94.864 percent of the voting stock of International which it had obtained solely in exchange for shares of its own voting stock. On 10 separate occasions between 1929 and 1951 American had purchased on the market an adjusted total of 16,150 shares of International stock which comprised 2.691⅔ percent of that company's outstanding stock.

In 1952, George Arents and Lena Arents were the owners respectively of 18,000 and 100 shares of capital stock of International and upon acceptance of American's offer they received in exchange for these shares 24,000 and 133⅓ shares respectively of the common stock of American. In their joint income tax return for the year 1952, George Arents reported a capital gain of $283,164.65 and Lena Arents reported a capital gain of $766.67 resulting from the aforesaid exchanges. Lena Arents died in 1954 and George Arents died in 1960. The executors of their estates are pursuing a claim for refund filed in 1954, contending that the taxpayers erroneously paid $48,-268.34 in taxes on the capital gains reported as resulting from the stock exchanges made in 1952. They contend that the 1952 exchange of stock was an exchange on reorganization within the provisions of section 112(b) (3) of the Internal Revenue Code of 1939, supra, resulting in no recognized gain or loss.

Section 112(b) (3) of the 1939 Code, supra, provides:

"* * * No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

Section 112(g) (1) (B), 26 U.S.C. (I.R.C.1939), § 112(g) (1) (B) (1952), defining reorganization as used in section 112(b) (3), provides:

"(1) The term 'reorganization' means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, * * *."

In essence the plaintiffs contend that the 1952 exchange of stock increased American's holdings of International's stock over the 80 percent requirement of section 112(g) (1) (B) solely by exchanging its own voting stock for that of International, and therefore this 1952 exchange was a tax free reorganization under section 112(b) (3). The Government contends it was not a tax free reorganization for two reasons: (1) American did not acquire 80 percent of International's stock in one single transaction; (2) American did not acquire International stock solely for its own stock but also for cash.

However, for reasons which will become apparent, we will at the outset discuss the second contention urged by the defendant; i. e., did the acquisition of stock for cash between 1929 and 1951 prevent the 1952 stock for stock exchange from being a reorganization under the terms of section 112(g) (1) (B).

The Seventh Circuit in the case of Howard v. Commissioner, 238 F.2d 943, wherein the acquiring corporation obtained 80.19 percent of the stock of the acquired company in exchange for its own stock and in the same transaction purchased the remaining 19.81 percent of stock for cash, held that due to the cash payment the transaction failed to meet the "solely" requirement of section 112(g) (1) (B) of the 1939 Code and, therefore, was not a tax free reorganization under section 112(b) (3). This decision followed a similar holding by the Supreme Court in Helvering v. Southwest Consolidated Corporation, 315 U.S.

194, 62 S.Ct. 546, 86 L.Ed. 789, construing section 112(g) (1) of the Revenue Act of 1934, 48 Stat. 680, 705. In that case, at page 198 of the opinion, 62 S.Ct. at page 549, the Court in plain and unequivocal language stated:

"* * * Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement."

■ The facts in the case at bar show that there were cash purchases involved in plaintiffs' stock acquisition prior to the 1952 stock for stock transaction. Consequently, in light of the above two cases, we can only hold that the 1952 exchange in the instant case did not meet the statutory requirement of section 112 (g) (1) (B) and, therefore, was not a reorganization thereunder.

Although plaintiffs contend that the cash transactions were not part of the 1952 exchange and therefore do not prevent the 1952 exchange from being considered an exchange "solely" of stock for stock, it must be borne in mind that the 1952 exchange was not by itself an exchange for 80 percent of the stock of the acquired corporation, and therefore did not meet that requirement of section 112(g) (1) (B). Although we do not find it necessary to consider the question of whether the 1912 exchange of stock "solely" for stock and the 1952 exchange can be combined in order to meet the 80 percent requirement of section 112(g) (1) (B), we do not see how the plaintiffs can take advantage of the unrelated 1912 exchange in order to meet the 80 percent requirement and at the same time disregard the similarly unrelated cash purchases. In our view, the plaintiffs' claim must stand or fall on the actual transactions which occurred and the plaintiffs cannot pick and choose for consideration those transactions which, considered by themselves, would make the 1952 exchange a reorganization.

■ It must be remembered that the statutory exemptions for tax purposes are a matter of legislative grace, and must be strictly construed. In view of the plain language of section 112(g) (1) (B) and the prior constructions of this language in Helvering v. Southwest Consolidated Corporation, supra, and Howard v. Commissioner, supra, we hold that the 1929 to 1951 cash transactions prevent the 1952 exchange from being a tax free reorganization and, therefore, bar plaintiffs from receiving the tax advantages arising out of section 112(b) (3).

As an alternative, however, plaintiffs, relying on Howard v. Commissioner, supra, contend that even if the 1952 exchange was not a reorganization under section 112(g) (1) (B) and, therefore, not exempt from recognition of gain under section 112(b) (3) because of the prior cash transactions, their part of the 1952 exchange being only of stock for stock is not a recognizable gain for tax purposes according to section 112(c) (1) of the 1939 Code.

Section 112(c) (1) provides:

"(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

■ In Howard v. Commissioner, supra, as noted earlier in this opinion, the court found that there was no tax free reorganization because the 80.19 percent of the stock of the acquired corporation was obtained in exchange for stock and 19.81 percent for cash. The court went on, however, to find that the taxpayers in that case were entitled to non-recognition of their gain result-

ing from the exchange under section 112(c) (1) because they had only received stock in exchange for their stock in the acquired corporation and did not receive any of the cash involved in the transaction. We think this decision by the Seventh Circuit was erroneous, as the Supreme Court so indicated in Turnbow, infra. Section 112(c) (1) only applies if a section 112(b) (3), supra, reorganization is not tax free because property other than stock or securities was involved in the exchange. Thus, there must first be a section 112(b) (3) reorganization before section 112(c) (1) can become operative. Section 112(b) (3) reorganizations can be any one of six different types and are defined in section 112(g) (1). Section 112(g) (1) in its entirety provides:

> "(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (E) a recapitalization, or (F) a mere change in identity, form, or place of organization, however effected."

In this case there was no reorganization as defined in section 112(g) (1) (B) (the only kind of reorganization contended for by plaintiffs), and therefore section 112(b) (3) does not enter into the picture. This being so, section 112 (c) (1) is also entirely irrelevant to the case.

This does not mean that section 112 (c) (1) can never apply to section 112 (b) (3) type transactions when property other than stocks or securities are involved in the transaction. This opinion only determines that it does not apply when the taxpayer who is claiming a section 112(g) (1) (B) or (C) reorganization fails to meet the requirements of either of those sections because the exchange was not solely for stock. For instance, a taxpayer might have a section 112(g) (1) (A) reorganization (a merger) in which both stock and some other property are given in exchange. This transaction would not be a tax free reorganization under section 112(b) (3) because property other than stock or securities was involved. However, in that event, under section 112(c) (1) those taxpayers who received stock in the transaction would not have to report a gain while those taxpayers who received the other property would have a recognized gain on this other property.

We believe this must have been the view of the Tax Court in Richard M. Mills, 39 T.C. No. 36, where the plaintiffs claimed a reorganization under section 368(a) (1) (B) of the 1954 Internal Revenue Code, which is comparable to section 112(g) (1) (B) of the 1939 Internal Revenue Code. In that case, close to 100 percent of stock and a minimal percent of cash were exchanged for stock in the acquired corporation. The Tax Court held, without mentioning the Howard case, supra, that there was no tax free reorganization and that section 356 (a) (1) of the 1954 Code, which is comparable to section 112(c) (1) of the 1939 Code, did not apply. It based its decision solely upon the decision of the Supreme Court in the recent case of Turnbow v. Commissioner, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326.

In Turnbow, the Court held that section 112(c) (1) did not apply because the

involved exchange was one of 70 percent cash and 30 percent stock, thus not meeting the basic 80 percent stock requirement of section 112(g) (1) (B).

We also believe the Turnbow case to be determinative of the alternative issue in this case, inasmuch as here, as in the Turnbow case, there was no section 112 (g) (1) (B) reorganization.

For the above reasons, plaintiffs' petition must be dismissed.

JONES, Chief Judge, and DAVIS and DURFEE, Judges, concur.

WHITAKER, Judge (dissenting).

I do not think any of the prior cases, neither Helvering v. Southwest Consolidated Corporation, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789, nor Howard v. Commissioner, 7 Cir., 238 F.2d 943, have dealt with the situation with which we are presented in this case.

I think we should hold that where a corporation, owning about 68 percent of the stock of another, all of which, except for 2.69 percent, has been acquired solely in exchange for its own voting stock, adopts a plan of reorganization of the two corporations and in pursuance thereof offers to exchange its voting stock solely for the remainder of the outstanding stock of the other, and the offer is accepted, a reorganization under section 112(g) (1) (B) has been effected, because, counting the stock acquired both before and after adoption of the plan of reorganization, more than 80 percent of the stock of the latter corporation has been acquired solely for the voting stock of the former, and the acquisition for cash of the small percentage of 2.69 percent, being wholly unrelated to the plan of reorganization, is to be disregarded.

Section 112(b) (3), upon which plaintiffs rely, reads:

"No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

Section 112(g) (1) (B), defining a reorganization, reads in part as follows:

"The term 'reorganization' means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, * * *."

In 1912, when American acquired 65.37 percent of the voting stock of International, there seems to have been no thought in mind of a reorganization. American apparently desired control of International, but they do not seem to have had in mind a reorganization of the two companies. Certainly what they did was not sufficient to effect one.

Then in 1929, some 17 years later, American, for some undisclosed reason, acquired 1.291⅔ percent of International stock, in addition to what it already had. Two years later, it acquired an additional .326 percent of International stock, and three years later .507 percent. Nothing more was done along this line for seven years. Then in 1951 it acquired an additional amount of .567 percent. These transactions gave American a total of slightly over 68 percent of the stock of International.

Up to this time there seems to have been no intention on the part of American to effect a reorganization with International, although American had sought control of International.

Then, in April 1952, American seems to have first conceived the idea of effecting a consolidation with International. Three things seemed to have induced it to arrive at this decision: (1) It wanted to settle a derivative stockholders' suit against International and itself; (2) it wanted to be able to include International in its consolidated financial statements, for the purpose, among other things, of

increasing its borrowing power under a certain credit agreement; (3) to enable it to include International in its consolidated Federal income tax return.[1]

Thus the stipulation of facts clearly indicates that this is the first time that any idea of a reorganization was conceived.

So, we are confronted with the application of section 112(g) (1) (B) of the 1939 Internal Revenue Code to a situation where one corporation, owning about 68 percent of the stock of another corporation, desires to effect a reorganization with it. It is obviously impossible for such a corporation to comply with the terms of 112(g) (1) (B), if that section is to be construed to require that 80 percent of the stock of the corporation acquired must be acquired pursuant to a plan of reorganization. Since it already owns 68 percent of the stock of that corporation, it obviously could not acquire an additional 80 percent of its stock.

Does this mean that in such a situation it was impossible for American to bring itself within the terms of section 112(g) (1) (B)?

In such a situation, is it not reasonable to construe section 112(g) (1) (B) to require that the acquiring corporation acquire sufficient additional stock in the other corporation to bring its holdings in it up to the 80 percent requirement?

If this is a permissible construction of section 112(g) (1) (B), the only other requirement is that the acquiring corporation had to acquire this additional amount of stock solely for its own voting stock. This American did, concededly.

I feel quite sure from the statement of facts that there never was a "plan of reorganization" until the issuance of American's prospectus on April 21, 1952. It was then that the plan of reorganization was born. All that went before, it seems to me, should be disregarded in the consideration of this case, except for the purpose of adding to the stock acquired after the formation of the plan of reorganization the stock previously acquired solely for its own voting stock. Therefore, we are obliged to construe section 112(g) (1) (B) as I have indicated above, or be compelled to say that a corporation, already owning 68 percent of the stock of another, cannot possibly qualify under section 112(g) (1) (B).

Can it be that in such case we must inquire how it had acquired the 68 percent, whether solely for its own stock, or partly for cash, and then hold that it comes within section 112(g) (1) (B), if the 68 percent was acquired solely for its own stock, but not, if a part was acquired for cash? This would seem to me illogical, where the 68 percent had not been acquired pursuant to "a plan of reorganization." What preceded the adoption of the plan of reorganization seems to me to be immaterial, except for the purpose of inquiring whether both before and after the adoption of the plan of reorganization 80 percent of the stock of the transferor corporation had been acquired solely for the voting stock of the transferee. It was what was done after the adoption of the plan that counts in determining whether the stock of the transferor was acquired "only" for the stock of the transferee.

But let us suppose that the statute is concerned, not with the reason behind the acquisition of the stock, but only with the acquisition itself, whatever may have been the reason for it. Then, it seems to me, our inquiry is, was 80

1. The eleventh paragraph of the stipulation of facts reads:

"In April 1952 American Machine & Foundry Company made an offer to the stockholders of International Cigar Machinery Company to exchange 1⅓ shares of American Machine & Foundry Company common stock for each share of the capital stock of International Cigar Machinery Company."

The twelfth paragraph states:

"In its Prospectus, dated April 21, 1952, the American Machine & Foundry Company stated that the purposes of this offer were: [those set out above]."

Then in the thirteenth paragraph the stipulation says that "Pursuant to this offer" the American acquired so many shares of International stock.

percent of the stock acquired solely for the voting stock of the acquiring corporation? If we find that it was, it seems to me immaterial that it may have acquired an additional percentage of stock for cash, at intervals in the intervening forty years, and not pursuant to a plan of reorganization.

In Howard v. Commissioner, supra, the transferee corporation offered to acquire 80.19 percent of the stock of the transferor for its voting stock, and the remaining 19.81 percent for cash, and this was done. The Seventh Circuit held that the acquisition for cash of a part of the stock, pursuant to the plan of reorganization, in addition to the 80 percent, took the case out of section 112(g) (1) (B). They apparently thought they were compelled to so hold by the Supreme Court's opinion in Helvering v. Southwest Consolidated Corp., supra.

In the Southwest Consolidated Corporation case there was a single transaction under which all the assets of the transferor corporation were acquired, but the consideration was partly cash, partly in voting stock and partly in stock warrants. As applied to such facts, the Supreme Court rightly held that the transaction did not meet the requirement that the acquisition be "solely" for the voting stock of the transferee. The consideration was voting stock (most of which was issued to creditors, not stockholders, of the transferor corporation), cash, the assumption of a liability of the transferor corporation (which was held to be the equivalent of cash), and stock warrants (which were held not to be the equivalent of "voting stock"). For more than one reason the Supreme Court held the transaction did not qualify under section 112 (g) (1) (B). It was not confronted with a situation where 80 percent of the stock of the transferor corporation had been acquired "solely" for the voting stock of the transferee, and, in addition, in a series of transactions, unrelated to the plan of reorganization, an additional percentage was acquired for cash.

In the case at bar, more than 94 percent of International was acquired "sole-

ly" for the voting stock of American, in two transactions. Only 2.69 percent was acquired for cash, in several separate and unrelated transactions. Can it be that the acquisition of this small percentage, at different times, unrelated to the plan of reorganization, so tainted the acquisition of the 94 percent as to completely change its character? I can see no reason why it should. More than the required 80 percent was acquired "solely" for American's voting stock. This seems to me to be all that is required. The acquisition at other times and in unrelated transactions of a small additional amount for cash cannot logically affect the other two transactions where the sole consideration was the voting stock of American.

This case differs from Howard v. Commissioner, supra, in that in the Howard case there was but one transaction involved, in which the offer of the acquiring corporation contemplated the payment of a part of the consideration in cash and a part in the voting stock of the transferee. While 90+ percent of the stock of the transferor was acquired, it could be said that it was not acquired "solely" for the voting stock of the transferee. In the case at bar in two separate transactions 94 percent of the stock of International was acquired "solely" for the voting stock of American. The additional 2.69 percent acquired for cash were acquired in a series of transactions, over a period of ten years, which had no connection whatever with the plan of reorganization or the other transaction in which stock was acquired "solely" for the stock of American. I can see no reason why these unrelated transactions change the character of the two transactions where 94 percent of the stock of International was acquired "solely" for American's voting stock.

In Turnbow v. Commissioner, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326, there was no reorganization because consideration for the transfer of stock by Turnbow was $1,235,625 worth of stock in the transferee, and $3,000,000 in cash. Since there was no reorganization, it was

held that sections 112(b) (3), as supplemented by 112(c) (1), were not applicable. These sections are set out in a note below.[2] This is all this case held. It does not seem to me to have any bearing on the question of whether there was a reorganization of American and International.

I think we should hold that where a corporation owning 68 percent of the stock of another decides on a plan of reorganization of the two and pursuant to the plan acquires an additional 26 percent of the stock of the other corporation solely for its own stock, such a corporation is entitled to go back to transactions prior to the adoption of the plan of reorganization and, in order to make up the required 80 percent, pick up additional stock of the other corporation which had been acquired solely for its own stock.

American had acquired more than 94 percent of the stock of International solely for its own stock. I think there was a reorganization under section 112 (g) (1) (B).

It would be permissible under the 1954 Code to add to stock last acquired holdings before the last acquisition. Section 368(a) (1) (B) requires that after the acquisition the acquiring corporation be in control of the other "(whether or not such acquiring corporation had control immediately before the acquisition)", and subparagraph (c) defines "control" to mean 80 percent of the combined voting power of all classes of stock and 80 percent of all other classes of stock.

This seems to embrace a case where, before adoption of the plan of reorganization, the acquiring corporation owned more than 50 percent of the stock of the other and, after adoption of the plan, acquired enough more to make up the 80 percent.

The right to do this is not so clear under the 1939 Code, but it is not prohibited and it is the only way a corporation owning 21 percent or more of the stock of another can bring itself within the terms of section 112(g) (1) (B). It is unreasonable to suppose Congress meant to deny to such companies the benefit of this section.

Since I cannot believe that the acquisition of 2.69 percent of International's stock long before the "plan of reorganization" takes the case out of section 112(g) (1) (B), I must respectfully dissent.

2. Section 112(b) (3) reads:
"Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."
Section 112(c) (1) reads:
"If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."